Vincent F. Gerbino Esquire
BRUNO, GERBINO, SORIANO & AITKEN, LLP
445 Broad Hollow Road, Suite 420
Melville, New York 11747
(631) 390-0010
*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
AMERICAN TRANSIT INSURANCE COMPANY,

                                                     Plaintiff,

     -against-

*The Purported Owner Defendant*
IRINA SLIVKO

*The Provider Defendant*
GLOBAL HEALTH PHARMACY CORP

*The Doe Defendants*
JOHN DOES 1-10

                                         Defendants.
-------------------------------------------------------------------------X

       Plaintiff, American Transit Insurance Company (hereinafter referred to as "American Transit"), by and through its attorney, BRUNO, GERBINO, SORIANO & AITKEN, LLP, as and for its Complaint against the defendants in this action, hereby alleges as follows:

## INTRODUCTION

       1.     This action seeks to stop a large, ongoing fraudulent scheme perpetrated by the Defendants who exploited the New York "No-Fault" insurance system by submitting more than **$355,458.62** in fraudulent pharmaceutical billing to American Transit. The Defendants' scheme overwhelmingly targeted expensive "pain-relieving" prescription drug products, which they

systematically dispensed to individuals involved in automobile accidents, who were treated – really mistreated – at various, different "medical clinics" throughout the New York Metropolitan area. As part of the fraudulent scheme and to maximize profits, the Defendants paid unlawful kickbacks or provided other financial incentives to steer large volumes of medically unnecessary and often invalid and/or unauthorized prescriptions to Global Health Pharmacy Corp ("Global Health").

2.      Global Health (sometimes referred to as "the Pharmacy") purports to be a neighborhood pharmacy but in fact it has been used by Irina Slivko ("Slivko"), along with the John Doe Defendants, as part of an integrated fraud scheme to exploit patients for financial gain by overwhelmingly targeting Lidocaine 5% Ointment, Diclofenac Sodium 3% Gel, and Cyclobenzaprine (collectively, the "Fraudulent Pain Products"), as well as certain other prescription drug medications (collectively, the "Fraudulent Pharmaceuticals"). The Fraudulent Pharmaceuticals were dispensed to individuals involved in automobile accidents who were eligible for insurance coverage under policies of insurance issued by American Transit (the "Insureds").

3.      In furtherance of the scheme, the Defendants entered into illegal, collusive arrangements with various prescribing providers (the "Prescribers") and unlicensed laypersons (the "Clinic Controllers") who work at or are associated with various multidisciplinary medical clinics that exclusively treat No-Fault patients (the "No-Fault Clinics"). Pursuant to these illegal, collusive agreements and to maximize profits, the Defendants steered the Prescribers and Clinic Controllers to prescribe and direct large volumes of prescriptions, or purported prescriptions, for the targeted Fraudulent Pharmaceuticals (i.e., the Fraudulent Pain Products) to Global Health. These prescriptions were issued without regard for patient care, pursuant to fraudulent predetermined protocols, and were in almost all instances unauthorized.

4.     The Defendants intentionally targeted the Fraudulent Pain Products to dispense to Insureds, in place of other effective but much-less costly prescription and non-prescription drug products, solely based on the medications' exorbitant pricing and high profit margins. In fact, approximately 90% of the billing submitted through the Pharmacy was for the Fraudulent Pain Products, typically with charges of $1,324.40 per single 200 mg prescription of Lidocaine 5% Ointment; $2,044.40 per single prescription of Diclofenac Sodium Gel 3%; and Cyclobenzaprine 7.5 mg tabs at $163.11.

5.     By this action, American Transit seeks to recover more than **$107,073.19** that the Defendants stole from it, along with a declaration that American Transit is not legally obligated to pay reimbursement to the Pharmacy of more than **$355,458.62** pending fraudulent No-Fault claims for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted through the Pharmacy because:

(i)     the Defendants billed for Fraudulent Pharmaceuticals that were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;

(ii)    the Defendants participated in illegal, collusive relationships in which they steered Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy, in exchange for unlawful kickbacks and other financial incentives;

(iii)   the Defendants intentionally inflated the billable charges to American Transit by targeting a specific set of pharmaceutical products (i.e., the Fraudulent Pain Products) that they acquired at low cost and had the Pharmacy dispense in large volumes to Insureds at egregious charges, in place of other effective less costly pharmaceuticals in order to exploit the reimbursement rates set forth by *12 N.Y.C.R.R. §§ 440.5(a) and (d)* (the "Pharmacy Fee Schedule"); and

(iv)    the Defendants submitted or caused to be submitted charges for the Fraudulent Pharmaceuticals through the Pharmacy pursuant to illegal, invalid, and/or duplicitous prescriptions.

6.     The Defendants' scheme began as early as 2013 and continues uninterrupted to the present day as the Defendants continue to submit fraudulent billing and pursue collection on their unpaid fraudulent claims against American Transit, as well as against other New York automobile insurers.

7.     As discussed more fully below, the Defendants at all times have known that: (i) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which they steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants inflated the billable charges to American Transit and exploited the Pharmacy Fee Schedule by intentionally targeting a specific set of pharmaceutical products (i.e., the Fraudulent Pain Products) that they acquired at low cost and had the Pharmacy dispense to Insureds in large volumes at exorbitant charges, in place of other effective, less-costly pharmaceuticals; and (iv) the Defendants submitted or caused to be submitted claims for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and/or duplicitous prescriptions, all while continuing to seek reimbursement on unpaid fraudulent claims.

8.     Based on the foregoing, the Defendants do not have – and have never had – any right to be compensated for any of the Fraudulent Pharmaceuticals allegedly dispensed to American Transit Insureds. The chart attached hereto as **Exhibit 1** sets forth a representative sample of the fraudulent claims that have been identified to date which the Defendants submitted, or caused to be submitted, to American Transit through the Pharmacy using the United States mail

seeking reimbursement under New York's No-fault law. As a result of the Defendants' scheme, American Transit has incurred damages of approximately **$107,073.19**.

## THE PARTIES

### A.     Plaintiffs

9.       Plaintiff American Transit Insurance Company is a corporation duly organized and existing under the laws of the State of New York, having its principal place of business at 5 Broadway Freeport, NY 11520.

### B.     Defendants

10.      Daniel Slivko ("Slivko") is a natural person residing in the State of New York, and is the principal records owner, officer and/or operator of Defendant Global Health Pharmacy Inc., and at all times relevant herein, operated, managed, and/or controlled its activities.

11.      Global Health Pharmacy Inc. ("Global Health") is a New York corporation, formed on or about August 28, 2012, with its principal place of business at "1424 RICHMOND AVE, STATEN ISLAND, NY, UNITED STATES, 10314" with service of process address of "KALB & ROSENFELD, P.C., 283 COMMACK ROAD, SUITE 210, COMMACK, NY, UNITED STATES, 11725." Global Health was first registered as a pharmacy with the New York State Office of Professions on November 30, 2012. The "Supervisor" is listed as 057395 – Kheir-Sidholm Marlin Magdy with a listed address of "STATEN ISLAND NY;" "Profession: Pharmacy (020);" "License Number: 057395;" "Date of Licensure: September 12, 2012;" Registered through Date February 28, 2027.

12.      Global Health is ostensibly owned, operated, managed, and/or controlled by Defendant Slivko and known – and voluminously described *infra* – as well as unknown individual(s) who American Transit reserves the right to formally name. At all relevant times

mentioned herein Global Health submitted fraudulent claims to Plaintiff seeking reimbursement for pharmaceutical products under the No Fault Law.

13.     John Does 1 through 10 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as Defendants when the extent of their participation becomes known through discovery.

## JURISDICTION AND VENUE

14.     Pursuant to *28 U.S.C. § 1331*, this Court has jurisdiction over claims brought under *18 U.S.C. §§ 1961 et seq.* (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

15.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to *28 U.S.C. § 1367*.

16.     Venue in this District is appropriate pursuant to *28 U.S.C. § 1391*, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

17.     American Transit underwrites primarily commercial automobile insurance in the State of New York.

## I. AN OVERVIEW OF NEW YORK'S NO-FAULT LAWS

18.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's *Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.)* and the regulations promulgated pursuant thereto (*11 N.Y.C.R.R. §§ 65 et*

seq.) (collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

19.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

20.     The No-Fault Laws limit reimbursement for pharmaceutical benefits to prescription drugs only. Over-the-counter ("OTC") drugs and products which may be purchased without a prescription are not covered expenses under the No-Fault Laws.

21.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

22.     Pursuant to New York's No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

23.     The implementing regulation adopted by the Superintendent of Insurance, *11 NYCRR § 65-3.16(a)(12)*, provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

24.     In *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 320 (2005) *and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.,* 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

25.     Pursuant to *New York Insurance Law § 403*, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to American Transit, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

26.     Pharmacies "may be held liable for medically unnecessary services" submitted to No-Fault insurers similar to other "downstream providers." See *Gov't Emples. Ins. Co. v. Wellmart RX, Inc.,* 435 F. Supp. 3d 443 (E.D.N.Y. 2020); *Gov't Emples. Ins. Co. v. Advanced Comp. Lab., L.L.C.,* 2020 U.S. Dist. LEXIS 224868 (E.D.N.Y. Dec. 1, 2020); *Long Is. Radiology v. Allstate Ins. Co.*, 36 A.D.3d 763, 764 (2d Dept. 2007).

## II. AN OVERVIEW OF APPLICABLE LICENSING LAWS

27.     Pursuant to *New York Education Law § 6808*, no person, firm, corporation, or association shall possess drugs, prescriptions, or poisons for the purpose of compounding, dispensing, retailing, wholesaling, or manufacturing, or shall offer drugs, prescriptions, or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

28.	Pursuant to *8 N.Y.C.R.R. § 29.1* pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

29.	Similarly, *8 N.Y.C.R.R. § 29.1* prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

30.	Pursuant to *8 N.Y.C.R.R. § 63.1(7)* pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

31.	*New York Education Law § 6810* prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug. Separate prescriptions are required for each drug prescribed and dispensed.

32.	Pursuant to *New York Education Law § 6810*, as of March 27, 2016 "no practitioner shall issue any prescription in this state, unless such prescription is made by electronic prescription from the practitioner to a pharmacy." Permitted exceptions include: (1) electrical or technological outages, (2) a waiver granted to the prescriber by the New York State Commissioner of Health based on a demonstrated exceptional hardship, (3) the use of electronic prescribing would cause a delay that would adversely affect the patient's health, (4) telephone prescriptions issued in emergency situations.

33.     For any non-electronic prescriptions issued in the state, *New York Education Law § 6810* requires the prescriber explicitly state in the patient's health record the specific exempt reason for why the prescription was issued in a manner other than electronically.

34.     *New York Education Law § 6810* prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

35.     *New York Education Law § 6512, § 6530(11), (18), and (19)*, aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

36.     *New York Education Law § 6530(17)* prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

37.     *New York Education Law § 6530(18)* prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

38.     *New York Education Law § 6509-a*, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

39.     Pursuant to *New York Education Law § 6808(2)(c),* "[t]he names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment.

The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

40.     Pursuant to *New York Education Law § 6808(e)*, every pharmacy shall be under the immediate supervision and management of a licensed pharmacist.

41.     Pursuant to *New York Education Law § 6808(e)*, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

42.     Pursuant to *New York Education Law § 6808(e)*, pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

43.     Pursuant to *New York Education Law § 6808(h)*, "an application for registration as a pharmacy shall be of good moral character." In this matter this law is of the upmost importance as demonstrated *infra* by a detailed description of the gross misconduct of the three main principals of this Global Health.

## III. THE DEFENDANTS' FRAUDULENT SCHEME

### A. Overview of the Scheme

44.     Beginning in 2023 and continuing uninterrupted through the present day, the Defendants implemented an integrated fraudulent scheme in which they used Global Health to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in exorbitant charges – which they were not eligible to receive – for Fraudulent Pharmaceuticals purportedly dispensed to the Insureds.

45.     Global Health presented as an independent, locally-owned, neighborhood pharmacy operating in and catering to the local community in Staten Island, New York, when in

fact, the Defendants began using Global Health as part of a single large-scale fraud scheme that exploited American Transit's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the same Fraudulent Pharmaceuticals in a predetermined, protocol, while intentionally ignoring a vast array of other medications readily available at a fraction of the cost.

46.     Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, Global Health's business targeted a limited set of pharmaceutical products (i.e., the Fraudulent Pain Products), which made up the overwhelming majority of claims submitted to American Transit. Specifically, the Defendants have submitted – to American Transit alone (an extremely small percentage New York's insureds) – over **$          ** in claims for reimbursement for the Fraudulent Pain Products, which account for well over 90% of the billing submitted through the Pharmacy.

47.     The Fraudulent Pain Products overwhelmingly targeted by the Defendants included Lidocaine 5% Ointment, Diclofenac Sodium Gel 3%, and Cyclobenzaprine, with charges typically of $1,324.40 per single prescription of Lidocaine 5% Ointment; $2,066.40 per single prescription of Diclofenac Sodium Gel 3%; and upwards of $163 per single prescription of Cyclobenzaprine 7.5 mg.

48.     The Defendants chose these products – Lidocaine; Diclofenac; Cyclobenzaprine – because they could acquire them at low cost and submit inflated claims for reimbursement to American Transit at exorbitant prices after illegally steering prescriptions to themselves. Moreover, the Defendants knew that similar OTC products that could be recommended to Insureds were not covered under the No-Fault Laws, thus leading the Defendants to target the prescription of the Fraudulent Pain Products despite the lack of medical necessity for these particular products.

49.     The Office of the Inspector General of the U.S. Department of Health and Human Services noted that Lidocaine and Diclofenac have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing. See *Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018)*.

50.     Slivko is purportedly the sole owner of Global Health. ("purported" – see *infra* for details) Her alleged "administrator/manager" Dmitry Sheps perjured himself when he testified under oath that Slivko is the sole owner. In fact evidence points to Sheps and others as having a piece of the fraudulent action.

51.     Slivko is not a licensed pharmacist, does not have any professional licenses, and had no background or experience in owning a pharmacy prior to the opening of Global Health. (See *infra* for details) Either do the other owners.

52.     Global Health did virtually nothing that would be expected of a legitimate pharmacy to develop its reputation, attract customers, and draw legitimate business.

53.     Slivko, along with certain of the John Doe Defendants, opened and operated the Pharmacy for the sole purpose of effectuating a multimillion-dollar pharmacy fraud scheme.

54.      Sheps has claimed that he and his wife randomly went "door to door" to various doctor's offices and handed out business cards to solicit business but it is highly unlikely that a "community retail pharmacy" opened and owned by a non-pharmacist without any background or experience in owning a pharmacy, would be able to legitimately generate hundreds of thousands of dollars of referrals. Notably, American Transit is only one of many automobile insurers in New York State.

55.     Slivko is the purported sole owner of Global Health, but others presently not identifiable or identified herein but which American Transit will learn more about through

discovery (i.e., the John Doe Defendants) participated in the operation and control of the Pharmacy along with Slivko, and facilitated illegal referral and financial arrangements designed to steer large volumes of prescriptions to the Pharmacy and generate large profits from the submission of fraudulent insurance claims to American Transit and other No-Fault insurers. (*See infra*)

56.     The Defendants and the John Doe Defendants entered into complex financial arrangements with one another and others, including Prescribers and Clinic Controllers at the No-Fault Clinics, that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks or other financial incentives for large volumes of medically unnecessary prescriptions for specifically targeted Fraudulent Pain Products.

57.     Unlicensed laypersons (i.e., the Clinic Controllers), rather than the healthcare professionals working at the No-Fault Clinics, create and control the patient bases at the clinics, dictate predetermined fraudulent treatment protocols used to maximize profits without regard to actual patient care, and select and dictate the downstream providers (including pharmacies) that receive prescriptions and referrals issued at the No-Fault Clinics. These predetermined protocols almost always involve the rendering and prescribing of excessive medically unnecessary healthcare goods and services and illegal referral and/or prescription practices.

58.     The prescriptions for the Fraudulent Pain Products steered to the Defendants were based on generic, preprinted, and boilerplate examination reports meant to justify continuous, voluminous, and excessive healthcare services, including prescriptions for pharmaceuticals, as part of predetermined protocols and collusive arrangements. Further, the Fraudulent Pain Products themselves often had no proven efficacy beyond what an over-the-counter equivalent could provide and were often duplicative of other medications contemporaneously prescribed and dispensed to the Insureds.

59.    The vast majority of the billing submitted to American Transit by the Defendants through Global Health was based on prescriptions issued, or purportedly issued, by just a few practitioners, notably one Yuliya Paritskaya PA and one Roman Shulkin MD. Shulkin is involved in a nasty dispute with the mother of his child wherein there is videotape that has been posted online some of which shows Shulkin making incriminating statements and posing with an alleged criminal that has been convicted of assaulting police officers. This has created an appearance unfit for a medical professional which if untrue should have been long rectified with a defamation action.

60.    Both Shulkin and Paritskaya work for Pain Management NYC at 2279 Coney Island Avenue in Brooklyn. Shulkin, Leon Reyfman MD and Mark Cohen MD allegedly work for said practice. However Sheps testified that both Shulkin and Paritskaya work for LR Medical as stated on the prescription. But the prescriptions only listed the individual prescriber's name and the address. LR Medical is a separate entity owned by Leon Reyfman located at 2277 Coney Island Avenue in Brooklyn. Shep's slip up is a demonstration that the medical providers are irrelevant and interchangeable – it is the layperson owner that is the real prescriber.

61.    Global Health received virtually identical sets of prescriptions. Specifically, Global Health routinely received prescriptions for specific Fraudulent Pain Products, namely, Lidocaine 5% Ointment and Diclofenac Gel 3%, and in many instances in conjunction with an oral medication, on a single date for a single patient. Here are just a few illustrative examples:

(i)    Insured AA (Claim No. 115-1719) was allegedly involved in a motor vehicle accident on July 5, 2024. Thereafter, AA presented to Yuliya Paritskaya as supervised by Mark Cohen MD of Pain Management NYC on September 6, 2024. Global Health then billed Plaintiffs for allegedly dispensing topical pain medication Lidocaine 5% ointment simultaneously with Diclofenac 3% external gel – another topical pain medication; along with Ibuprofen 400 mg to AA pursuant to a prescription allegedly issued by Paritskaya on September 6, 2024 billing American Transit a total of $2,515.84 dollars.

(ii)     Insured JCV (Claim No. 115365-01) was allegedly involved in a motor vehicle accident on August 16, 2024. Thereafter, JCV presented to Yuliya Paritskaya supervised by Mark Cohen of Pain Management NYC on August 23, 2024. Global Health then billed Plaintiffs for allegedly dispensing topical pain medication Lidocaine 5% ointment simultaneously with muscle relaxant Cyclobenzaprine Hydrochloride 7.5mg Tablets and Naproxen 500 mg tab – another muscle relaxant medication – pursuant to a prescription allegedly issued by Paritskaya on August 23, 2024 billing American Transit a total of $1,572.25 dollars.

(iii)    Insured ND (Claim No.113779) was allegedly involved in a motor vehicle accident on October 3, 2023. Thereafter, ND presented to Roman Shulkin MD of Pain Management NYC on September 16, 2024. Global Health then billed Plaintiffs for allegedly dispensing topical pain medication Lidocaine 5% ointment simultaneously with Diclofenac 3% external gel to ND pursuant to a prescription allegedly issued by Roman Shulkin on September 16, 2024 billing American Transit a total of $3395.80 dollars.

(iv)    Insured FD (Claim No.1146392) was allegedly involved in a motor vehicle accident on April 6, 2024. Thereafter, FD presented to Roman Shulkin MD of Pain Management NYC on September 12, 2024. Global Health then billed Plaintiffs for allegedly dispensing Lidocaine 5% ointment simultaneously with and Diclofenac 3% external gel – both are topical pain medications – to FD pursuant to a prescription allegedly issued by Roman Shulkin on April 6, 2024 billing American Transit a total of $3,621.20 dollars.

62.     The initial examination reports issued by, or in the name of Shulkin and Paritskaya included voluminous boilerplate lists of predetermined services and goods for virtually every Insured.

63.     The Defendants' scheme to dispense the Fraudulent Pharmaceuticals in large volumes using kickbacks or other financial incentives ensured that the Prescribers and Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy regardless of (i) the distance of the pharmacy to the Insureds' residences or the Prescribers' practices and (ii) the fact that there were countless other pharmacies located much closer to the Insureds' residences.

64.     Insureds were never given the option to use a pharmacy of their choosing.

65.     In fact, well over half of the Insureds that allegedly received pharmaceuticals dispensed by Global Health lived outside of Staten Island, New York, where the Pharmacy is

located, with the Insureds' residences scattered throughout the City of New York including Kings, Bronx, New York, Richmond, and Nassau counties. In some instances, the Insureds who received, or purportedly received, pharmaceuticals dispensed by Global Health resided outside the State of New York, such as New Jersey and Pennsylvania.

66.     But for the Defendants' illegal, collusive agreements with the Prescribers and Clinic Controllers, these Insureds would not have received pharmaceutical products from a pharmacy that is located in a county or city outside of their place of residence.

67.     Instead, the Prescribers and Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to Global Health, irrespective of the Pharmacy's inconvenient location to the Insureds' residences or the Prescribers' practices, because the prescriptions were being issued pursuant to illegal, collusive kickback agreements.

68.     The Pharmacy, in exchange for the payment of kickbacks or other financial incentives, received medically unnecessary prescriptions from the Prescribers and Clinic Controllers at the No-Fault Clinics pursuant to fraudulent predetermined protocols.

69.     The Defendants used the prescriptions obtained from the No-Fault Clinics to bill American Transit and other insurers for the Fraudulent Pharmaceuticals.

70.     The Prescribers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals to their patients.

71.     After having the prescriptions steered to Global Health, the Defendants purportedly delivered the Fraudulent Pharmaceuticals directly to the Insureds' residence.

72.     The Defendants implemented their pharmaceutical fraud scheme involving the Prescribers and Clinic Controllers knowing that: (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for

financial gain, without regard to genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of illegal, collusive agreements intended to inflate the billing from the Pharmacy to insurers and to financially enrich the Defendants; (iii) the Defendants inflated the billing to American Transit by intentionally targeting a specific set of pharmaceutical products (i.e., the Fraudulent Pain Products) that they dispensed in large volumes to Insureds through the Pharmacy with exorbitant charges; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of OTC and prescription medications proven to have therapeutic effects and available at a fraction of the cost.

73.     The Prescribers and Clinic Controllers would not have engaged in the illegal, collusive arrangements with the Defendants in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacy, unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives.

**B.     The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Genuine Regard for Patient Care**

74.     The goal of medical treatment is to help patients get better in a timely manner and with a medically necessary course of treatment. Notwithstanding this basic goal, the Insureds treated by the Prescribers at the No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from the Pharmacy – were virtually always subjected to a predetermined, medically unnecessary and prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of Insureds' medically appropriate and timely return to good health.

75.     Evidence-based best practices guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain. Oral NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

76.     More recently, in 2019, the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report, which focused on pain management and the treatment of acute and chronic pain. According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate. Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., oral NSAIDs) should be used as first line therapy for patients for whom medications are clinically appropriate.

77.     Like the WHO and DHHS, the New York State Workers' Compensation Board's ("NYS WCB") published medical treatment guidelines state that oral NSAIDs are recommended as first-line medications for the treatment of neck and back pain, and that over-the-counter

medications should be tried prior to prescription NSAIDs. *See New York State Workers' Compensation Board Medical Treatment Guidelines, Mid and Lower Back Injury* (May 2022, p. 36); *New York State Workers' Compensation Board Medical Treatment Guidelines, Mid and Lower Back Injury* (May 2022, p. 32).

78.     Drugs should not be prescribed when there is no indication for use as every medication carries an inherent risk for adverse events.

79.     For a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting or receiving a person's sensation of pain.

80.     Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated. For example – patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

81.     With respect to treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries), clinical studies of FDA-approved topical NSAIDs, such as Diclofenac Gel 1% have shown that they are no more effective than a placebo.

82.     Despite these guidelines and the basic goal of helping patients recover in a timely fashion, the Prescribers produced generic and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that the healthcare providers at the various No-Fault Clinics purported to render to Insureds as part of a predetermined protocol, which lacked any individualized treatment whatsoever. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products.

83.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the Prescribers often did not know whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

84.     The Prescribers failed to document in their examination reports whether the patients were intolerant of oral medications thereby necessitating a prescription for a Fraudulent Pain Product.

85.     The Prescribers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by the Pharmacy were actually used by the patient.

86.     The Prescribers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals dispensed by the Pharmacy provided any relief to the patient or whether the patient experienced any side effects associated with the prescribed pharmaceutical product.

87.     Nevertheless, the Prescribers routinely prescribed voluminous Fraudulent Pharmaceuticals, including multiple Fraudulent Pain Products on the same date to a single patient without regard to genuine patient care.

## C. The Fraudulent Pain Product Prescriptions

88.     In accordance with the fraudulent scheme discussed above, and despite the best practices outlined above, the Pharmacy routinely billed American Transit for exorbitantly priced pain gels, ointments, and other products, overwhelmingly in the form of Lidocaine 5% Ointment, Diclofenac Gel 3%, and Cyclobenzaprine in various doses – pursuant to duplicitous prescriptions

solicited from Prescribers and Clinic Controllers in exchange for kickbacks or other financial incentives.

**a. The Fraudulent Topical Lidocaine Ointment**

89.     The Defendants solicited the Prescribers and the Clinic Controllers to provide them with voluminous prescriptions for Lidocaine 5% Ointment because the Defendants could readily buy Lidocaine 5% Ointment at low cost but bill American Transit and other New York No-Fault insurers through the Pharmacy for huge sums based on alleged egregiously high wholesale prices.

90.     Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections. Notably, Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

91.     Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

92.     The NYS WCB's published guidelines stressed the risks of adverse side effects associated with topical pain medications such as lidocaine, by specifically stating that "topical agent[s] should be prescribed with strict instructions for application and maximum number of applications per day to obtain the desired benefit and avoid potential toxicity." See *NYS WCB Medical Treatment Guidelines, Mid and Lower Back Injury* (May 2022, p. 38); *NYS WCB Medical*

*Treatment Guidelines, Mid and Lower Back Injury* (May 2022, p. 34). However, the Prescribers often did not indicate the maximum dosage on any prescriptions for Lidocaine 5% Ointment.

93.     Notably, Lidocaine ointments and patches with 4% Lidocaine are available over-the-counter and have a similar efficacy as Lidocaine 5% Ointment at a fraction of the cost.

94.     Over-the-counter products such as Icy Hot Lidocaine which contains 4% Lidocaine, are available at most well-known pharmacy retailers such as Rite-Aid and Target for advertised prices in the range of $10.

95.     Despite this, the Prescribers never recommended Insureds first use over-the-counter lidocaine products to treat their minor aches and pains sustained in relatively minor motor vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribers routinely prescribed Insureds Lidocaine 5% Ointment and directed the prescriptions to the Pharmacy, typically billing $1,324.40 per prescription.

96.     The initial examination reports prepared by the Prescribers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions.

97.     According to *New York State Workers' Compensation Board, Non-Acute Pain Medical Treatment Guidelines*, (First Edition, September 15, 2014, page 38; August 25, 2021 Update, effective May 2, 2022, page 39), *New York State Workers' Compensation Board, Mid and Low Back Injury*, (First Edition, September 15, 2014; August 25, 2021 Update, effective May 2, 2022, page 38) and the *New York State Workers' Compensation Board, Neck Injury*, (First Edition, September 15, 2014; August 25, 2021 Update, effective May 2, 2022, page 34): "Topical lidocaine is only indicated when there is documentation of a diagnosis of neuropathic pain. In this instance, a trial for a period of no greater than four weeks can be considered, with the need for documentation of functional gains as criteria for additional use."

98.      The prescribing providers routinely failed to document any functional deficit that could be managed by topical Lidocaine or a contraindication to use oral medications, demonstrating that the Lidocaine 5% ointment was routinely dispensed as part of an illegal kickback arrangement in furtherance of the scheme to defraud alleged herein.

99.      By way of example and not limitation, Lidocaine 5% ointment was prescribed to Insureds, dispensed by Global Health and billed to Plaintiffs for reimbursement in the following instances where the examination reports recorded no incidence of neuropathic pain or any functional deficit appropriate for the prescription. These are just a few examples amongst just about every Insured:

(i)      Insured AA (Claim No. 115-1719) was allegedly involved in a motor vehicle accident on July 5, 2024. Thereafter, AA presented to Yuliya Paritskaya as supervised by Mark Cohen MD of Pain Management NYC on September 6, 2024. Global Health then billed Plaintiffs for allegedly dispensing topical pain medication Lidocaine 5% ointment. The examination reports recorded no incidence of neuropathic pain or any functional deficit appropriate for the prescription.

(ii)     Insured JCV (Claim No. 115365-01) was allegedly involved in a motor vehicle accident on August 16, 2024. Thereafter, JCV presented to Yuliya Paritskaya supervised by Mark Cohen of Pain Management NYC on August 23, 2024. Global Health then billed Plaintiffs for allegedly dispensing topical pain medication Lidocaine 5% ointment. The examination reports recorded no incidence of neuropathic pain or any functional deficit appropriate for the prescription.

(iii)    Insured ND (Claim No.113779) was allegedly involved in a motor vehicle accident on October 3, 2023. Thereafter, ND presented to Roman Shulkin MD of Pain Management NYC on September 16, 2024. Global Health then billed Plaintiffs for allegedly dispensing topical pain medication Lidocaine 5% ointment. The examination reports recorded no incidence of neuropathic pain or any functional deficit appropriate for the prescription.

(iv)     Insured FD (Claim No.1146392) was allegedly involved in a motor vehicle accident on April 6, 2024. Thereafter, FD presented to Roman Shulkin MD of Pain Management NYC on September 12, 2024. Global Health then billed Plaintiffs for allegedly dispensing  Lidocaine 5% ointment. The examination reports recorded no incidence of neuropathic pain or any functional deficit appropriate for the prescription

100.    The initial or follow-up evaluation reports routinely failed to include any potential reason why prescription Lidocaine 5% ointment was medically necessary above and beyond a substantially similar and/or lower strength alternatives that were FDA approved and commercially available at a fraction of the cost, such as Aspercreme, Icy Hot and Bengay.

101.    Global Health billed $1,324 for a relatively small amount ("200" – we assume mg) of Lidocaine 5% ointment. However, over the counter alternatives, such as Aspercreme and Icy Hot, are commercially available at a retail cost of less than $20 – as low as $10 – and contain Lidocaine 4%.

102.    Despite this disparity in cost for a substantially similar product Global Health regularly dispensed and billed for Lidocaine 5% ointment without any indication in the examination reports that the patient first tried any commercially available alternative, even for minor sprains.

103.    Global Health dispensed Lidocaine 5% ointment for Insureds and submitted bills to Plaintiffs for reimbursement even though the evaluation reports and/or other documentation in support of this billing demonstrated no medical necessity for Lidocaine 5% ointment instead of Lidocaine 4% ointment or any indication that the significantly cheaper, commercially available alternative was considered.

104.    Additionally, Global Health also routinely dispensed and billed Plaintiffs for reimbursement of Lidocaine 5% ointment despite the fact that it was prescribed concurrently with oral medications, such as NSAIDs and muscle relaxers, and/or concurrently with another Topical Pain Cream, such as Diclofenac 3% gel, in order to maximize profits without regard for patient care.

105.     The prescribing providers routinely failed to document any functional deficit that could be managed by topical Lidocaine or a contraindication to use oral medications, demonstrating that the Lidocaine 5% ointment was routinely dispensed as part of an illegal kickback arrangement in furtherance of the scheme to defraud alleged herein.

106.     Likewise, the follow-up examination reports often failed to address whether the Lidocaine 5% Ointment prescribed provided any pain relief to the Insured or was otherwise effective for the purpose prescribed, to what degree, or whether the Insured experienced any side effects.

107.     In fact, pursuant to these fraudulent protocols and collusive arrangements, Insureds often received prescriptions for Lidocaine 5% Ointment, as well as other Fraudulent Topical Pain Products and Fraudulent Pharmaceuticals, as a matter of first line therapy regardless of their age or individual medical histories, injuries, subjective complaints, or other factors. These prescriptions were issued by Prescribers at the time of the Insureds' initial examinations – within 20 days or less of the accident – without the Prescribers first having recommended oral pain relievers or over-the-counter products.

108.     The Defendants' egregious billing coupled with the Prescribers failure to properly document the prescriptions for Lidocaine 5% Ointment, or the Insureds' use of this medication, further indicates that there was no legitimate medical reason for the Prescribers to have prescribed large volumes of Lidocaine 5% Ointment to the Insureds, or for the Defendants to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects and the availability of comparably effective and less-costly over-the-counter alternatives.

**b. The Fraudulent Diclofenac Prescriptions**

109.     In addition to the excessive amounts of Lidocaine 5% Ointment dispensed by the Pharmacy, and to further maximize their profits, the Defendants also routinely billed American Transit – through Global Health – for exorbitantly priced diclofenac sodium topical products – predominately Diclofenac Sodium Gel 3% (the "Topical Diclofenac Products"), pursuant to prescriptions solicited from Prescribers and Clinic Controllers.

110.     As with the prescriptions for Lidocaine 5% Ointment, the Defendants solicited the Prescribers and the Clinic Controllers to provide them with prescriptions for the Topical Diclofenac Products so they could bill for this pharmaceutical product at exorbitant charges, which further inflated the charges submitted to American Transit and other New York No-Fault insurers.

111.     The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

112.     The "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

113.     Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

114.     The above was never done with the insureds herein.

115.     Diclofenac Sodium Gel 3% dispensed and billed by the Defendants through Global Health, is only FDA approved to treat a precancerous skin condition known as actinic keratosis.

116. Further, Diclofenac Sodium Gel 3% does not have any proven efficacy or safety in the treatment of musculoskeletal injuries such as sprains or strains, nor is the use of topical diclofenac to treat musculoskeletal injuries an accepted "off-label" use. In fact, some clinical studies of topical NSAIDs have shown them to be no more effective than placebo for treating acute pain (e.g., pain from strains, sprains, contusions, or overuse injuries) in superficial locations.

117. Yet, Prescribers prescribed, and the Defendants dispensed, Diclofenac Sodium Gel 3% to Insureds with no documented history of actinic keratosis or any precancerous skin conditions.

118. Initial examination reports prepared by the Prescribers never stated the medical basis for the prescriptions.

119. Moreover, the Prescribers' follow-up examination reports never addressed whether Topical Diclofenac Products prescribed provided any pain relief to the Insured or was otherwise effective for the purpose prescribed, to what degree, or whether the Insured experienced any side effects.

120. Notwithstanding the FDA approved uses for the Topical Diclofenac Products, or the risks associated with diclofenac sodium prescriptions, the Prescribers steered voluminous prescriptions to the Pharmacy for the Topical Diclofenac Products, and the Defendants dispensed and billed for these products in excessive amounts, pursuant to predetermined fraudulent protocols and collusive arrangements, without any genuine regard for patient care or safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

121. The Defendants submitted exorbitant charges to American Transit typically $2,291.80 per prescription of Diclofenac Sodium Gel 3%.

### c. The Fraudulent Cyclobenzaprine

122.    The Defendants solicited the Prescribers and the Clinic Controllers to also provide them with voluminous prescriptions for Cyclobenzaprine 7.5 mg as well as other dosages of Cyclobenzaprine – because the Defendants could dispense Cyclobenzaprine at exorbitant profit margins, regardless of genuine patient care.

123.    Global Health repeatedly billed for Cyclobenzaprine 7.5 mg despite the fact that there are numerous other muscle relaxers available at a fraction of the charge.

124.    In fact, muscle relaxants – even at 7.5 mg once per day – are intended for short-term use and have the potential for abuse and addiction.

125.    The initial examination reports prepared by the Prescribers virtually never stated the medical basis for these prescriptions.

126.    Moreover, the Prescribers' follow-up examination reports virtually never addressed whether the Cyclobenzaprine prescribed provided any symptom relief to the Insured or was otherwise effective for the purpose prescribed, to what degree, or whether the Insured experienced any side effects.

127.    The Defendants submitted exorbitant charges to American Transit typically For the standard 7.5 mg – a typical bill is $163.11 for a mere 30 tablets.

## D. The Exploiting Of Patients For Financial Gain Through The Illegal, Collusive Arrangements Among The Defendants, Prescribing Providers And Clinic Controllers

128.    To effectuate the fraudulent scheme, the Defendants steered the Prescribers and Clinic Controllers to routinely prescribe and direct prescriptions to the Pharmacy for large volumes of the specifically targeted Fraudulent Pharmaceuticals (i.e., the Fraudulent Pain Products)

pursuant to their collusive arrangements, which egregiously inflated the charges submitted to American Transit.

129.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

130.    Here, the Defendants colluded with Prescribers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribers prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Pain Products, and then have those prescriptions directed to the Pharmacy so that the Defendants could bill American Transit huge sums.

131.    In furtherance of the scheme, the Prescribers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

132.    The Prescribers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often being prescribed without regard to pharmacologic outcomes; the

Fraudulent Pharmaceuticals were often being prescribed with gross indifference to patient health, care and safety; the Fraudulent Pain Products were prescribed as a matter of course without any recommendation that patients first try OTC products; and that the Fraudulent Pharmaceuticals were prescribed without attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

133. The Defendants, in collusion with the Prescribers and Clinic Controllers, made sure the Insureds never had the option to use a pharmacy of their choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to the Pharmacy notwithstanding that (i) in most instances the No-Fault Clinics and the patients themselves were located in counties far from Pharmacy and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

134. After having the prescriptions steered to the Pharmacy, the Defendants purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, or alternatively, the Insureds were given the Fraudulent Pharmaceuticals dispensed by the Pharmacy directly from the front desk staff at the various No-Fault Clinics.

135. The Defendants, Prescribers, and Clinic Controllers never gave the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by the Pharmacy, and to ensure that the Defendants benefited financially from the prescriptions.

136. The Prescribers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to the patients, and the Pharmacy had no legitimate reason to dispense, the Fraudulent Pharmaceuticals in large quantities to their patients.

137. The Prescribers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy rather than to a multitude of

other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to the patients.

138.    The Defendants, Prescribers, and Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacy, unless they profited from their participation in the illegal scheme.

139.    But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribers would not have prescribed the Fraudulent Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribers and Clinic Controllers would not have directed the prescriptions to the Pharmacy.

140.    The Defendants, Prescribers, and Clinic Controllers affirmatively concealed the particular amounts paid in kickbacks for steering the prescriptions to the Pharmacy since such kickbacks are in violation of New York law.

141.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by the Pharmacy.

142.    The payment of kickbacks or other financial consideration issued by the Defendants was made at or near the time the prescriptions were issued.

**E. The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to American Transit**

143.     Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

144.     Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained. The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

145.     Pursuant to *12 N.Y.C.R.R. §§ 440.5(a)* and *(d)* (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

146.     For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

147.     The Defendants solicited the Prescribers and Clinic Controllers to provide them with voluminous prescriptions for the Fraudulent Pain Products because the Defendants could readily buy the Fraudulent Pain Products at low cost but bill American Transit and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

148. The Defendants intentionally targeted the Fraudulent Pain Products, with extremely expensive "average wholesale prices," in order to inflate the billing submitted through the Pharmacy and to maximize their profits.

149. In support of its charges, the Pharmacy sometimes submitted: (i) an NF-3 Form which included the purported NDC numbers, units, and corresponding charges for each drug product; (ii) a copy of the Prescribers' prescription; (iii) a delivery receipt; and (iv) an assignment of benefit form assigning the Insureds' benefits to the Defendants.

150. The provision of the above forms was not always uniform beyond the NF-3.

151. The NDC numbers listed on the NF-3 Forms submitted by the Defendants through the Pharmacy are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

152. The Defendants never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Pain Products that they dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for Fraudulent Pain Products.

## IV. THE DEFENDANTS' SUBMISSION TO AMERICAN TRANSIT OF FRAUDULENT NF-3 FORMS

153. To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits have consistently been submitted to American Transit by and on behalf of the Pharmacy seeking payment for pharmaceuticals for which they are ineligible to receive.

154. These forms, including NF-3 Forms and other supporting records that the Defendants submitted or cause to be submitted to American Transit, were false and misleading in the following material respects:

(i) The NF-3 Forms and other supporting records uniformly misrepresented to American Transit that the Fraudulent Pharmaceuticals were medically necessary

and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

(ii)    The NF-3 Forms and other supporting records uniformly misrepresented to American Transit that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care, and that Defendants complied with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*. In fact, the Fraudulent Pharmaceuticals were medically unnecessary and Defendants did not comply with all material licensing requirements in that the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct medically unnecessary and illegal prescriptions for the Fraudulent Pharmaceuticals in exchange for unlawful kickbacks and other financial incentives;

(iii)    The NF-3 Forms and other supporting records uniformly misrepresented to American Transit that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care, and that the charges were proper and not excessive. In fact, the Defendants inflated the charges to American Transit by intentionally targeting a specific set of pharmaceutical products (i.e., the Fraudulent Pain Products) that the Pharmacy dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to American Transit; and

(iv)    The NF-3 Forms and other supporting records uniformly misrepresented to American Transit that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care, and that the Defendants complied with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*. In fact, the Fraudulent Pharmaceuticals were medically unnecessary and the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and/or duplicitous prescriptions.

155.    As a direct result of Defendants' scheme, and in reliance on the fraudulent billing submissions made through the Pharmacy, American Transit was led to voluntarily issue payments to Defendants totaling more than **$107,073.19**

## V. THE FINDINGS OF AMERICAN TRANSIT'S INTENSIVE INVESTIGATION CORROBORATE AND AMPLIFY THE ABOVE ALLEGATIONS

### A. The Examination Under Oath of Global Health Pharmacy by Dmitry Sheps

156.    On March 5, 2025 as part of American Transit's additional verification requests involving several claims one Dmitry Sheps appeared for an Examination Under Oath. Sheps is not a pharmacist nor is he educated as such. There is information that points to the owner of Global Health – one Irina Slivko – spending most of her time in Florida.

157.    There is also evidence that Sheps – amongst others that will be discussed – has an ownership interest in Global or at least a profit incentive.

158.    Sheps testified that he is the Administrator/Manger of Global Health. Sheps further testified that Slivko is the sole and only owner. (P.7-8) (Slivko is not a pharmacist nor educated as such) Yet Sheps knew that Global Health was filed with the Department of State on August 28, 2012. He also knew the law firm that handled the filing. Sheps also knew that the location of the pharmacy was a furniture store prior to the pharmacy moving in. It had to renovated. (P.8-9) Sheps testified that he began working at Global Health the first day it opened for business – January 4, 2013. Sheps knew that the pharmacy encompassed 2,400 feet and that the rent is $7,600 per month and he further identified the landlord. (P.11-13) Information indicates – without certainty – that Sheps is associated with a pharmaceutical wholesaler: Cochran Wholesale Pharmaceutical LLC.

159.    We know from his own testimony that Sheps and his wife own a company called "Sheps Consulting Company" which Global Health purportedly pays for marketing services. (P. 22) As stated it is our founded belief that Global Health would not gain referring doctors and/or insureds from other counties – they are in Staten Island (crossing the Verrazano Bridge is prohibitive cost wise) – by visiting doctors offices and handing out pens. It is more likely that

Sheps is taking profits through payments to Sheps Consulting – an area that will have to be explored in discovery.

160.    Sheps Consulting Corp is allegedly located at 248 Kensington Avenue, Basement Floor, Staten Island, NY, 10305. It is quite literally the basement of a duplex home. Sheps Consulting is a Staten Island based corporation that filed with the Department of State on 01/14/2014. The contact is one Daria Sheps – Dimitri's wife – at the above basement. Other public records indicate that this basement is associated with Sheps.

161.    The above Sheps Consulting address is also associated with an entity and related individuals that perform "business funding" – which means they front money which is repaid through collateralized receivables. This is often abused in No Fault. One of the members of the funding entity is also a medical provider that is registered at that address with the NPI – one Estera Babayeva FNP. She is a nurse that is also associated with medical marketing and various injection therapies.

162.    Indeed, when Sheps testified he appeared to be hesitant to disclose Slivko's name the reason for which will become abundantly clear *infra*.

Q.    And is there one or more owners of Global Health Pharmacy Corp.?
A.    There is one owner.
Q.    Who is the owner of Global Health Pharmacy Corp.?
A.    You need the name? [That's the question]
Q.    Who –
A.    Do you need the name? [That's the question]
Q.    Yes, please.
A.    (Inaudible)

Then Sheps spells the name.

163.    Sheps testified that the pharmaceuticals were delivered directly to the patients. A driver employed by Global Health was used to make deliveries in Staten Island. There was a

separate driver employed by Global Health to make deliveries in Kings County. "Long distance deliveries" are made by a company called LI Courier. (P.16-18)

164.    Sheps testified that medications were mainly delivered. Sheps testified that they would call the patient to make sure the address was correct. Then the driver picks up the medications along with the delivery slip and Assignment of Benefits form. The driver then delivers making sure to get the patient's signature. The driver's verify the patient's identification by checking their ID. The driver then brings back the AOB and Delivery slip at some point after the delivery.

165.    The above is unworkable and highly unfeasible. Even for a driver covering just Staten Island what is the likelihood that the insured will be home to make a personal ID checking – and signed for delivery. Insureds work. Shop. Drive children around etc. A missed delivery would necessitate a return visit etc. The same is true for Brooklyn. Once we get into the hinterlands of the rest of the City and beyond the territory is just too immense.

166.    Sheps testified that the Global Health Pharmacy telephone number is (718) 370-1220. An after hours phone call to the above number yielded a generic voicemail merely indicating that the caller had reached the above number. To wit the greeting did not inform the caller that they had reached Global Health. The number itself is a Verizon landline registered to one Rosemary Cuepo Pineda as a work phone. Ms. Pineda was not identified by Sheps as an employee of Global Health.

167.    Sheps testified that an entity called New York Billing and Processing [NY Billing and Processing] submits Global Health's bills to insurance companies. The address on Global Health's bills to insurance companies – 1733 Sheepshead Bay Road, Brooklyn NY – is New York Billing's address. According to Sheps Global Health would send the following to New York

Billing – "the page of medication, what the amount of money, what each medication is for, we send the prescription, of course, the AOB, sign and date it, and the delivery slip." (P. 27)

168. Sheps slipped up again when he said that Global Health signed and dated the Assignment of Benefits form. That must be done by the patient. This goes to the impossibility of delivery. The questioner did Sheps a favor by leading him to correct the above. (Id)

169. No one from Global Health reviews the bills before they are sent out. (P. 27-28)

170. Sheps initially testified that Global Health gets the checks. After prodding by his attorney he changed that to New York Billing. Once New York Billing gets the checks they then send the checks to Global Health. (P.28-29) That does not appear to be feasible. It begs the question of why not just list Global Health's address on the bills and let the insurance companies send the checks there directly. In any event after review and accounting by Slivko or Sheps the checks are then deposited in Global Health's bank account by Sheps [probably because Slivko is out of state]. Shep's lawyer objected to questions as to what bank Global Health used. Slivko is the sole holder of signature authority (P.29-31)

171. What is relevant is that New York Billing and its Principal one Yana Mironvoich have been the subject of three known RICO actions containing credible well plead factual allegations of fraudulent schemes that although not involving pharmaceuticals do involve the same modus operandi as is present in this case. Specifically, the payment of kickbacks by downstream providers – engineered by New York Billing as alleged in the RICO actions – to medical clinics in exchange for patient referrals for expensive goods/services. *See Government Employees Insurance Company et al v. Yana Mironovich, New York Billing and Processing Corp. et al*. 1:22-cv-03728-LDH-SJB (EDNY); *Government Employees Insurance Company et al. v. Yana Mironvoich, New York Billing and Processing Corp. et al*. 1:22-cv-02965-EK-LB (EDNY);

*Allstate Insurance Company et al. v. Yana Mironvoich, New York Billing and Processing Corp. et al*. 1:23-cv-08070-RPK-LKE (EDNY)

172.     Deeper dives into these litigations evince, amongst other anomalies, brazen admissions by New York Billing and its Principal to the allegations contained therein and far worse through the use of reliance upon the Fifth Amendment. Notably, Mironovich asserted that Mironovich "invokes her Fifth Amendment privilege in response to this request" to every interrogatory and every document request in *Government Employees Insurance Company et al. v. Yana Mironvoich, New York Billing and Processing Corp. et al*. 1:22-cv-02965-EK-LB. *See* Doc # 307. This is stupendously breathtaking owing not only to the blanket admissions that this conduct creates but by the fact that the privilege applies only to testimony in select – albeit extremely important – settings. Certainly not document requests in civil litigation.

### B. Other Findings of the Investigation

173.     *See Maks Kutsak v. Irina Slivko*, (Index No. 510886/2022) (Kings County Supreme) In this ongoing and highly contentious litigation one Maks Kutsak alleges the following with exhibits consisting of proof in evidentiary form: On August 28, 2012, Kutsak and Irina Slivko, formed Global Health Pharmacy Corp., each as fifty percent owners of the common stock in the Pharmacy. Slivko had no prior experience in forming or running a pharmacy and relied on Kusak for his experience and expertise in running a pharmacy. From August 2012 to the end of 2014, Kutsak and Slivko contributed equally in financing the Pharmacy with capital contribution loans exceeding $600,000 in the aggregate. Kutsak actively managed the construction, sourced the products and equipment, and hired the personnel for the Pharmacy. He developed and grew the business, connected it with local communities, and ensured customer satisfaction and loyalty

through the maintenance of quality care, services and products. Kutsak also ensured that the Pharmacy complied with federal, state and local regulations.

174.    March 26, 2016, Plaintiff and Defendant formed a second company, Global Home Care, Inc. each as fifty percent owners of the Home Care. For over 9 years, from on or about August of 2012 until on or about November of 2021, Kutsak and Slivko shared equally in the profits of the Pharmacy through distributions, management fees and salaries.

175.    Kutsak's payments for his share of profits, distributions, management fees and other payments from his ownership of the Pharmacy were made to Kutsak's one hundred percent owned limited liability companies.

176.    On April 24, 2020, Slivko, on behalf of the Pharmacy, applied for a loan through the Payroll Protection Program ("PPP loan") from Ridgewood Savings Bank. In the Pharmacy PPP loan application, Slivko identified Kutsak as the Vice President and fifty percent owner of the Pharmacy.

177.    Slivko initialed the following certification regarding her representations in the Pharmacy loan application and signed the application:

> I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

178.    Slivko also signed a Borrower Certification in connection with the Pharmacy loan application provided to Ridgewood Savings Bank on behalf of the Pharmacy, dated May 2, 2020, in which Slivko represented and warranted that "all information provided to Lender, including

without limitation, all information regarding the borrower's financial condition, is accurate to the best of its knowledge and that the Borrower, if any, has not withheld any material information." The Borrower Certification further stated, "Borrower further acknowledges that any false statements to Lender can be considered a false statement to the federal government under 18 USC Section 100, and may subject the Borrower to criminal penalties and that the Lender and the SBA are relying upon the information submitted by the Borrower."

179.     On April 7, 2020, Slivko on behalf of the Home Care corporation, applied for a loan through the Payroll Protection Program from Ridgewood Savings Bank. The application contained the following question:

> Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business? If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A.

Slivko responded by checking the box marked "yes."

180.     Slivko attached the required addendum A which read as follows:

> Irina Slivko and Maks Kutsak are owners of the entity Global Health Pharmacy. Ownership is a 50% split. Business is a pharmacy storefront in Staten Island New York.

181.     Slivko initialed the following statement regarding her representations in the Home Care loan application:

> I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

Slivko signed the application on April 7, 2020.

182.     Slivko filed a PPP loan application with Citibank that contained representations by Slivko that Slivko and Kutsak are equal owners of the Pharmacy.

183.     On August 25, 2020, Slivko submitted a "New Customer Profile" to Citibank in which Slivko identified herself and Kutsak as owners of the Pharmacy for ten years.

184.     On May 18, 2020, the Pharmacy received the PPP loan from Ridgewood Savings Bank for $62,248.30.

185.     Despite all of the above on October 30, 2021, Slivko's son-in-law, Michael London, told Kutsak that Kutsak could not prove that he owned fifty percent of the Pharmacy and offered to pay Kutsak $250,000 for Kutsak's interest in the Pharmacy. Kutsak said "No."

186.     On November 6, 2021, Slivko requested a meeting with Kusak at the Home Care office. They met on November 10, 2021. At the meeting, Slivko told Kusak that he is not a legal owner of the Pharmacy and offered to pay him $200,000 for Kutsak's fifty percent interest in the Pharmacy and $2,000,000.00 for Kusak's fifty percent interest in the Home Care. Kusak declined said offers.

187.     In retaliation for Kutsak's refusal to sell both his interests in the Home Care and the Pharmacy to Slivko, on November 16, 2021, Slivko removed Kutsak as an authorized signatory from the Pharmacy's Ridgewood Savings Bank account and ceased paying Kusak his share of monthly distributions and management fees to which he was entitled as equal owner of the Pharmacy.

188.     On November 20, 2021, Kutsak went to Ridgewood Savings Bank located in Kings County to check on the account balance of the Pharmacy and was told by the assistant manager at the bank that Defendant had removed Plaintiff as an authorized signatory from the Pharmacy account.

189.     On December 10, 2021, Julie Vaiman, the bookkeeper, accountant and attorney for Home Care requested a meeting with Kusak in her office in Kings County. At the meeting, Vaiman offered to pay Kutsak $1.5 million for Kutsak's fifty percent interest in Home Care and $200,000 for Kutsak's fifty percent interest in the Pharmacy. Kutsak declined said offer.

190.     In January 2022, Slivko replaced Dmitriy Timofeyev, the accountant for the Pharmacy since its inception in 2012, with Julie Vaiman.

191.     A number of legal wars soon broke out.

192.     In *Maks Kutsak, Directly and Derivatively on Behalf of Nominal Defendant, Global Home Care, Inc. v. Irina Slivko, Michelle Koliskor, and Michael London* (Index No. 514920/2022) (Kings County) Kutak asserts factual allegations regarding Slivko's use of "shell companies" – "at least two shell companies-Horizon QA Services ("Horizon") and MKISR Corp. ("MKISR")-to embezzle more money from Home Care." He asserts that the shell companies are but "paper entities." Beginning in December 6, 2019, without Kutsak's knowledge or approval, Slivko caused Home Care to make a series of round-number payments to Horizon. The payments were mostly in $5,000 increments, but some were in increments of $10,000, $7,500, and $2,500. The payments were made each month-and sometimes multiple times per month-between December 2019 and May 2022. In addition Slivko caused Home Care to make a series of round-number payments to MKISR. A payment of $50,000 was made on July 28, 2020. Later payments were in increments of, inter alia, $12,500, $10,000, $5,000, $2,500, and $1,000.

193.     What is relevant herein is that shell entities are often the conduit for illegal kickbacks in no fault fraud as well as a mechanism to launder illicit proceeds.

194.     Slivko's counter claims are not kind to Kutsak. In fact the allegations – some of them factual – fly throughout this massive sprawling litigation consisting thus far of some 657

filings detailing fraud; theft; conversion; embezzlement; destruction of property and office equipment; money laundering; sextortion; bad faith; defamation; and poor computer skills. This is something no Court should be put through.

195.     No matter the outcome of these two litigations the following rings true: These are not people that should be running a pharmacy.

196.     In lock step with the above carnage costumers are taking to the Internet to voice their concerns and complaints about Global. Specifically Global no longer accepts credit card payments. Instead they request checks that are sometimes mailed and invariably never received according to Global. Sometimes Global requests the bank account numbers and routing numbers from wary customers. Items that have been paid for are not being delivered. One customer complained to the Better Business Bureau only to be informed that Global is a not accredited therein.

## VI. THE DEFENDANTS' FRAUDULENT CONCEALMENT AND AMERICAN TRANSIT'S JUSTIFIABLE RELIANCE

197.     The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to American Transit seeking reimbursement for these products.

198.     To induce American Transit to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

199.     Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for medical necessity and genuine patient care; and (ii) the Defendants were

involved in collusive kickback arrangements with the Prescribers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to American Transit and other New York insurance companies.

200.    The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribers but from the same location in order to reduce the amount of billing based on any single licensee.

201.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

202.    Because the billing and supporting documentation submitted by Defendants did not reveal its fraudulent nature, American Transit voluntarily issued payments in response to the Defendants' billing submissions in accordance with the No-Fault Laws.

203.    American Transit is under statutory and contractual obligations to process claims promptly and fairly within 30 days. The facially-valid documents that were submitted to American Transit in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause American Transit to rely upon them. As a result, American Transit has incurred damages of more than **$107,073.19** representing payments voluntarily made by American Transit in response to the bills submitted by the Defendants containing fraudulent charges.

204.    The Defendants have hired law firms to pursue collection from American Transit and other insurers of the fraudulent charges submitted through the Pharmacy. These law firms routinely file numerous individual, expensive, and time-consuming collection proceedings, in piece-meal fashion against American Transit and other insurers if the charges are not promptly paid in full, all as part of the scheme and to monetize the Defendants' fraudulent activity as quickly

as possible. In fact, the Defendants continue to have legal counsel pursue collection against American Transit and other insurers without regard for the fact that the Pharmacy have been engaged in fraud.

205.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from American Transit, American Transit did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**THE FIRST CLAIM FOR RELIEF**
**Against Global Health and Slivko**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

206.    American Transit incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

207.    There is an actual case in controversy between American Transit and Global Health regarding approximately $       in fraudulent pending billing – which number is continuously increasing – for the Fraudulent Pharmaceuticals that the Defendants submitted, or caused to be submitted, to American Transit through Global Health.

208.    Global Health has no right to receive payment for any pending bills submitted to American Transit for the Fraudulent Pharmaceuticals because Global Health billed for pharmaceutical products that were medically unnecessary and/or prescribed and dispensed pursuant to predetermined fraudulent protocols designed solely for financial gain, without regard for genuine patient care.

209.    Global Health has no right to receive payment for any pending bills submitted to American Transit for the Fraudulent Pharmaceuticals because the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic

Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to Global Health in exchange for unlawful kickbacks and other financial incentives, without regard to genuine patient care.

210.    Global Health has no right to receive payment for any pending bills submitted to American Transit for the Fraudulent Pharmaceuticals because the Defendants inflated the billable charges to American Transit by intentionally targeting a specific set of pharmaceutical products that Global Health dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

211.    Global Health has no right to receive payment for any pending bills submitted to American Transit for the Fraudulent Pharmaceuticals because the Defendants submitted or caused to be submitted charges for the Fraudulent Pharmaceuticals dispensed by Global Health pursuant to illegal, invalid, and/or duplicitous prescriptions.

212.    Accordingly, American Transit requests a judgment pursuant to the *Declaratory Judgment Act, 28 U.S.C. §§ 2201* and *2202*, declaring that Global Health has no right to receive payment for any pending bills for the Fraudulent Pharmaceuticals submitted to American Transit through the Pharmacy.

**THE SECOND CLAIM FOR RELIEF**
**Against Slivko**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

213.    American Transit incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

214.    Global Health is an ongoing "enterprise," as that term is defined in *18 U.S.C. § 1961(4)*, that engages in activities which affect interstate commerce.

215.    Slivko knowingly conducted and/or participated, directly or indirectly, in the conduct of Global Health's affairs through a pattern of racketeering activity consisting of repeated

violations of the federal mail fraud statute, *18 U.S.C. § 1341* based upon the use of the United States mail to submit or cause to be submitted fraudulent charges on a continuous basis for over two years, seeking payments that Global Health was not eligible to receive under the No-Fault Laws because: (i) the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct medically unnecessary prescriptions for the Fraudulent Pharmaceuticals to Global Health in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally inflated the billable charges to American Transit by targeting a specific set of pharmaceutical products (i.e., the Fraudulent Pain Products) that they acquired at low cost and had Global Health dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (iv) the billed-for pharmaceutical products were the product of illegal, invalid, and/or duplicitous prescriptions. The fraudulent bills and corresponding mailings submitted to American Transit that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as **Exhibit 1**.

216.     Global Health's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Slivko operated Global Health, inasmuch as Global Health never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Global Health to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the

fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Global Health to the present day.

217. Global Health is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants. These inherently unlawful acts are taken by Global Health in pursuit of inherently unlawful goals – namely, the theft of money from American Transit and other insurers through fraudulent No-Fault billing.

218. American Transit has been injured in its business and property by reason of the above-described conduct in that it has paid more than **$107,073.19** pursuant to the fraudulent bills submitted by the Defendants through Global Health.

219. By reason of its injury, American Transit is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. §1964(c)*, and any other relief the Court deems just and proper.

## THE THIRD CLAIM FOR RELIEF
### Against Slivko and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

220. American Transit incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

221. Global Health is an ongoing "enterprise" as that term is defined in *18 U.S.C. § 1961(4)*, that engages in activities which affect interstate commerce.

222. Slivko and the John Doe Defendants are employed by and/or associated with the Global Health enterprise.

223.     Slivko and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Global Health's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, *18 U.S.C. § 1341* based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that Global Health was not eligible to receive under the No-Fault Laws because: (i) the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Global Health in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally inflated the billable charges to American Transit by targeting a specific set of pharmaceutical products (i.e., the Fraudulent Pain Products) that that they acquired at low cost and had Global Health dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (iv) the billed-for pharmaceutical products were the product of illegal, invalid, and/or duplicitous prescriptions. The fraudulent bills and corresponding mailings submitted to American Transit that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as **Exhibit 1**.

224.     Slivko and the John Doe Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud American Transit and other insurers of money)

by submitting or facilitating the submission of the fraudulent charges to American Transit and by continuing to seek collection of those fraudulent charges.

225.    American Transit has been injured in its business and property by reason of the above-described conduct in that it has paid approximately **$107,073.19** pursuant to the fraudulent bills submitted by the Defendants through Global Health.

226.    By reason of its injury, American Transit is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. §1964(c)*, and any other relief the Court deems just and proper.

### THE FOURTH CLAIM FOR RELIEF
### Against All Defendants
### (Common Law Fraud)

227.    American Transit incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

228.    Global Health, Slivko and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to American Transit and concealed material facts from American Transit in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Global Health.

229.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for pharmaceutical products were medically necessary and properly billed when in fact the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Global Health acted in accordance with material licensing requirements and is therefore entitled to receive No-Fault Benefits pursuant to *Insurance*

*Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12),* when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Global Health in exchange for unlawful kickbacks and other financial incentives; (iii) in every claim, the representation that Global Health acted in accordance with material licensing requirements and is therefore entitled to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact the Defendants intentionally inflated the billable charges to American Transit by targeting a specific set of pharmaceutical products (i.e., the Fraudulent Pain Products) that that they acquired at low cost and had Global Health dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law; and (iv) in every claim, the representation that Global Health acted in accordance with material licensing requirements and is therefore entitled to receive No-Fault Benefits pursuant to *Insurance Law § 5102(a)(1)* and *11 N.Y.C.R.R. § 65-3.16(a)(12)*, when in fact the billed-for pharmaceutical products were the product of illegal, invalid, and/or duplicitous prescriptions, rendering the pharmacy ineligible for reimbursement for No-Fault benefits.

230.    Global Health, Slivko and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce American Transit to pay charges submitted through Global Health that were not compensable under the No-Fault Laws.

231.    American Transit has been injured in its business and property by reason of the above-described conduct in that it has paid approximately **$107,073.19**   pursuant to the fraudulent

bills submitted, or caused to be submitted, by Global Health, Slivko and the John Doe Defendants through Global Health.

232.    Global Health, Slivko, and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles American Transit to recover punitive damages.

233.    Accordingly, by virtue of the foregoing, American Transit is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE FIFTH CLAIM FOR RELIEF
### Against All Defendants
### (Unjust Enrichment)

234.    American Transit incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

235.    As set forth above, Global Health, Slivko, and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of American Transit.

236.    When American Transit paid the bills and charges submitted by or on behalf of Global Health for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Global Health, Slivko, and the John Doe Defendants' improper, unlawful, and/or unjust acts.

237.    Global Health, Slivko, and the John Doe Defendants have been enriched at American Transit's expense by American Transit's payments, which constituted a benefit that Global Health, Slivko, and the John Doe Defendants voluntarily accepted and profited from, as a

result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

238.    Global Health, Slivko, and the John Doe Defendants' retention of American Transit's payments violates fundamental principles of justice, equity and good conscience.

239.    By reason of the above, Global Health, Slivko, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of **$$107,073.19**.

**WHEREFORE**, Plaintiff American Transit Insurance Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Claim for Relief against Global Health and Slivko, a declaration pursuant to the *Declaratory Judgment Act, 28 U.S.C. §§ 2201* and *2202*, that Global Health has no right to receive payment for any pending bills, amounting to approximately **$355,458.62** in charges submitted to American Transit;

B.    On the Second Claim for Relief against Slivko, compensatory damages in favor of American Transit in an amount to be determined at trial but in excess of **$107,073.19** together with treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)* plus interest;

C.    On the Third Claim for Relief against Slivko and the John Doe Defendants, compensatory damages in favor of American Transit in an amount to be determined at trial but in excess of **$107,073.19**;

, together with treble damages, costs, and reasonable attorneys' fees pursuant to *18 U.S.C. § 1964(c)* plus interest;

D.    On the Fourth Claim for Relief against Global Health, Slivko and the John Doe Defendants, compensatory damages in favor of American Transit in an amount to be determined at trial but in excess of **$107,073.19**, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.    On the Fifth Claim for Relief against Global Health, Slivko, and the John Doe Defendants, compensatory damages in favor of American Transit in an amount to be determined at trial but in excess of **$107,073.19**, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: Melville, New York
       December 18, 2025

                              **BRUNO, GERBINO & SORIANO & AITKEN, LLP**

                              By:     *Vincent F. Gerbino*
                                      VINCENT GERBINO
                                      *Attorneys for Plaintiff*
                                      445 Broad Hollow Road, Suite 420
                                      Melville, New York 11747-4712
                                      (631) 390-0010
                                      (631) 393-5497 – *facsimile*